IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **G.R.** by his next friends, guardians and Parents, **WILLIAM RUSSELL**, as Parent and individually, **KAREN RUSSELL**, as Parent and individually, | Civil Case No. 3:10-CV-00232-KI<br><br>OPINION AND ORDER |
| Plaintiffs, | |
| vs. | |
| **DALLAS SCHOOL DISTRICT No. 2**, an Oregon school district, **CHRISTY PERRY**, individually and in her official capacity as Superintendent of Dallas School District, **SUSAN GARTLAND**, individually and in her official capacity as Director of Special Education of Dallas School District, **MICHAEL BECK**, individually and in his official capacity as Assistant Principal of Dallas High School, **BRIAN GREEN**, individually and in his office capacity as Assistant Principal of Dallas High School, | |
| Defendants. | |

Page 1 - OPINION AND ORDER

Kevin Charles Brague
The Brague Law Firm, LLC
12972 SW Tearose Way
Tigard, Oregon   97223

      Attorney(s) for Plaintiff(s)

J. Channing Bennett
Luke W. Reese
Kelly D. Noor
Kim E. Hoyt
GARRETT HEMANN ROBERTSON P. C.
1011 Commercial Street NE
P. O. Box 749
Salem, Oregon  97308-0749

      Attorney(s) for Defendant(s)

King, Judge:

    After his family moved from Wisconsin, plaintiff G.R. enrolled as a student at defendant Dallas School District No. 2 ("District") in September 2006.  Shortly thereafter, G.R. began to misbehave in a manner his parents considered consistent with his disabilities.  Although G.R. had several individualized education programs ("IEP's") during the next two years, his parents were unhappy with his educational progress and increasingly worse behavior.  In September 2008, G.R.'s parents unilaterally enrolled him in a private residential school, where G.R. made progress.  When the parents sought a due process hearing, the ALJ found that the District violated the Individuals with Disabilities Education Act ("IDEA") in four ways, but she did not award any remedy.  G.R. and his parents then came to federal court to allege claims under the IDEA, several disability discrimination statutes, and common law torts.  The parties' cross motions for summary judgment are before the court.  For the reasons below, I grant summary judgment and dismiss all claims which

Page 2 - OPINION AND ORDER

are not based on the IDEA. On the IDEA claim, I find no additional IDEA violations, I do not award compensatory education, and I do not reimburse plaintiffs for the private residential placement.

<strong>FACTS</strong>

Before enrolling at the District, G.R. attended Lake Country Academy in Wisconsin. He enrolled as a middle school student in the District at the beginning of the 2006-2007 school year. An IEP team found G.R. eligible for special education services and put an IEP in place for him. In April 2007, the District expelled G.R. for up to one year for bringing to school a wine opener containing a small knife.

The District allowed G.R. to return from the expulsion early and begin high school in the fall of 2007. At the time G.R. entered Dallas High School, Susan Gartland was the Special Education Director for the District and Frank Parker was G.R.'s case manager.

In October 2007, a female student, J.S., reported to District Administrator Brian Green that G.R. sexually assaulted her. The District reported the sexual assault to the Dallas Police Department, which investigated and arrested G.R. for Sexual Abuse III. The District Attorney filed a petition with the Polk County Juvenile Court.

The District held a Manifestation Determination meeting on October 19, 2007 at which the IEP team concluded that G.R.'s conduct was neither directly related to his specific learning disability nor a result of the school's failure to implement the IEP. The District suspended G.R. effective October 17, 2008 and held an expulsion hearing on December 14, 2008. On January 23, 2008, the hearing officer reinstated G.R.'s 2007 expulsion.

G.R.'s expulsion ended on April 16, 2008. He returned the next day to the District's New Options program. New Options is taught in a self-contained classroom for about a dozen students whose behavior is tracked on a daily basis.

On August 13, 2008, G.R.'s parents sent the District a letter notifying it that they rejected the prior IEP for G.R. and asked the District to pay for a private residential placement at Provo Canyon School in Utah.

On August 18, 2008, G.R. pleaded guilty to the Sexual Abuse III charge. The Judgment: Jurisdiction of the Juvenile Court states, "The youth shall participate in the Provo Canyon School treatment program for a minimum of one year or until he has successfully completed sex offender treatment as recommended by Dr. Senn." D315 at 2.[1]

G.R. enrolled at Provo Canyon School on September 1, 2008 and attended until August 21, 2009. He then enrolled at Highland High School, a public high school in Salt Lake City, where G.R. resided with his mother.

On December 8, 2009, G.R.'s parents filed a due process hearing request seeking relief for the denial of a free appropriate public education ("FAPE") and compensation for the private placement of G.R. The due process hearing took place for ten days between April 19 and 30, 2010. During the hearing, the District subpoenaed the Polk County Juvenile Office to deliver G.R.'s juvenile records to the ALJ for an in camera review.

The ALJ issued the Final Order on June 16, 2010 which dismissed more than 20 of the parents' allegations and found in the parents' favor on four issues:

---

[1] The court will preface defense exhibits with the letter D and the student's exhibits with the letter S.

1.    The parents established that the District failed to provide Prior Notice of Special Education Action for the change in G.R.'s placement decided at the April 11, 2008 IEP meeting which placed G.R. in the New Options program on his return from the expulsion on April 17, 2008.  The ALJ concluded this was a de minimis procedural violation which did not deny G.R. a FAPE.

2.    The parents established that the District failed to include data in the April 11, 2008 IEP for the Present Level of Academic Achievement and Functional Performance ("PLOP") assessments, progress towards G.R.'s goals, and actual progress G.R. was making.  The ALJ concluded that this denied G.R. a FAPE because the lack of data prevented the IEP team members from meaningfully participating in the discussion.

3.    The parents established that the District failed to create an IEP on April 11, 2008 that was reasonably calculated to enable G.R. to receive meaningful educational benefit.

Based upon the preponderance of the evidence, the April 2008 IEP was not reasonably calculated to provide meaningful educational benefit to Student, at the time it was drafted.  Due to the lack of current assessments and baseline data on Student's current achievement or functional performance, the April 2008 IEP was unable to provide teachers with a way to determine if Student was making any progress.  Knowing where a student is at the start of an IEP is critical to determining if the educational program will be of any benefit to the student.  The April 2008 IEP failed to meet the legal requirements for a FAPE from April 17, 2008 (the date it was implemented) until October 10, 2007 when a new IEP was completed.

Channing Decl. Ex. 3, at 55 [hereinafter Final Order].

4.    The parents established that the District failed to provide Prior Written Notice of the IEP team meeting on October 10, 2008.  The ALJ concluded that this was a de minimis procedural violation which did not deny G.R. a FAPE because the parents knew of the meeting and the father attended, along with his attorney.

The ALJ then considered the parents' request for tuition reimbursement for G.R.'s private placement at Provo Canyon School.  The ALJ found that G.R. was required to participate in sex offender treatment as part of his juvenile court plea agreement, but the ALJ was not persuaded that G.R. had to attend Provo Canyon School for this reason.  The ALJ did not find sufficient evidence

Page 5 - OPINION AND ORDER

that Provo Canyon School individually designed an educational program to provide educational benefit to G.R. Based on the record, the ALJ found that the parents did not establish that Provo Canyon School or any residential facility was necessary to provide special education and related services. Thus, the ALJ did not order the District to reimburse the parents for G.R.'s tuition at Provo Canyon School because the ALJ concluded that it was not an appropriate placement.

Finally, the ALJ considered the parents' request for two years of compensatory education. After the ALJ acknowledged Ninth Circuit holdings that compensatory education is an equitable remedy and not a contractual remedy, she discussed the parents' conduct. The ALJ found that the parents knew that G.R.'s mental health and behavior issues had caused difficulties in school before G.R. enrolled in the District, but the parents repeatedly and deliberately hid this information from the District. Moreover, Provo Canyon School and the Salt Lake City School District had both assessed G.R. after he left the District. Balancing these points, the ALJ concluded that it would not be equitable to require the District to perform additional assessments and testing of G.R. to make up for the prior failure to do so.

## LEGAL STANDARDS

In actions to review the decision of a hearing officer under the IDEA,

the court "(i) shall receive the records of the [state] administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). We have construed section 1415(i)(2)(C) as calling for de novo review of the state hearing officer's findings and conclusions. At the same time, section 1415(i)(2)(C)'s mandate that "the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings." Thus, the court "must give deference to the state hearing officer's findings, particularly when . . . they are thorough and careful," and avoid "substitut[ing] [its] own notions of sound educational policy for those of the school authorities which [it] review[s.]" In the

end, however, the court is free to determine independently how much weight to give
the state hearing officer's determinations.

Ashland Sch. Dist. v. Parents of Student R.J., 588 F.3d 1004, 1008-09 (9th Cir. 2009) (some

citations omitted).   A hearing officer's findings are "thorough and careful when the officer

participates in the questioning of witnesses and writes a decision contain[ing] a complete factual

background as well as a discrete analysis supporting the ultimate conclusions." R.B. v. Napa Valley

Unified Sch. Dist., 496 F.3d 932, 942 (9th Cir. 2007).

For the non-IDEA claims, summary judgment is appropriate when there is no genuine dispute

as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ.

P. 56(a).  The initial burden is on the moving party to point out the absence of any genuine dispute

of material fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

through the production of probative evidence that there remains a fact dispute to be tried.  Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the court "must

view the evidence on summary judgment in the light most favorable to the non-moving party and

draw all reasonable inferences in favor of that party."  Nicholson v. Hyannis Air Service, Inc., 580

F.3d 1116, 1122 n.1 (9th Cir. 2009) (internal quotation omitted).

## DISCUSSION

I.      Evidentiary Issue

The District argues the court should not consider the new evidence plaintiffs submitted in the

form of declarations and deposition excerpts taken after the due process hearing.  The District

contends the IDEA does not authorize witnesses to repeat or embellish their prior administrative

hearing testimony.  Moreover, the District asks me to exclude the evidence because it was available

at the time of the Hearing and should have been considered by the ALJ.  In a procedural argument, the District claims plaintiffs should have asked for leave of court before introducing the evidence.

Plaintiffs argue that the District incorrectly bases its argument on a mediation provision which does not apply to federal court review.  I note that the statute has been amended numerous times.  The applicable language used to be part of 20 U.S.C. § 1415(e) and is now contained in § 1415(i).  Subsection (e) now concerns mediation.  The substance of the applicable regulation has not changed, and the case law interpreting it is still good law.

On the merits, plaintiffs contend the additional evidence they offered does not change the character of the proceedings because the administrative hearing included records from Provo Canyon School and Highland High School.

Under the IDEA, the court may hear "additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C).  "Additional" is construed to mean supplemental. Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1472-73 (9th Cir. 1993).  Witnesses at the court trial may not "repeat or embellish their prior administrative hearing testimony."   Id. at 1473.  The reasons for "supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing." Id. (internal quotation omitted).

Plaintiffs submitted declarations from William Russell, G.R.'s father, and J.S., as well as deposition excerpts for six of the witnesses at the due process hearing.  This material is all admitted for purposes of the non-IDEA claims discussed below, if it is relevant.

I will now address the admission of the disputed material for the IDEA claim. Based on the Ojai Unified definition of "additional evidence," I do not admit the declaration of J.S. because it does not concern events subsequent to the due process hearing. I also see no reason to disturb the ALJ's decision not to admit this declaration because plaintiffs' counsel did not provide it in a timely manner.

I admit William Russell's declaration because it primarily concerns G.R.'s education at Highland High School in Salt Lake City, which he attended during his junior and senior years, well after the due process hearing. I realize that the educational transcripts attached to Russell's declaration also cover the years G.R. attended Dallas High School and Provo Canyon School, a time period generally before the due process hearing, but I do not think the information comes as a surprise to the parties.

I do not admit the deposition excerpts of Rich Robison, Susan Gartland, Kristi Perry, Michael Beck, and Karen Russell because the testimony concerns events which took place before the due process hearing. I also do not admit the deposition excerpts of William Russell. His testimony concerns events which took place before the due process hearing, other than pages 94 and 95 which concern G.R.'s work at Highland High School. I do not admit these two pages because they duplicate his declaration.

## II.   IDEA

Plaintiffs allege the District violated the IDEA: (1) by failing to identify, assess, or evaluate G.R. for eligibility for an IEP; (2) by procedurally and substantively failing to follow the law for an IEP for G.R., which resulted in a denial of a FAPE; and (3) by failing to reimburse them for the private residential placement of G.R. Plaintiffs ask this court to review the Final Order. They seek

Page 9 - OPINION AND ORDER

compensatory education from August 2006 through August 2009;[2] reimbursement for the private residential placement at Provo Canyon School; attorney fees and costs for the due process hearing, as well as this case; and reimbursement for all medical, mental, and other educationally-related evaluations.

The parties filed cross motions for summary judgment on the IDEA claim.  The District asks me to affirm the Final Order, arguing the ALJ made thorough, careful, detailed findings which correctly applied the law to the facts.  Plaintiffs agree with the ALJ's conclusion that the District denied G.R. a FAPE, but they argue that the denial started on an earlier date than found by the ALJ. Plaintiffs also disagree with the ALJ's failure to award compensatory education and failure to require the District to reimburse plaintiffs for G.R.'s private residential placement at Provo Canyon School.

I find that the ALJ's 59-page Final Order is a thorough and careful opinion because of its extensive discussion of the facts and analysis.  After careful consideration of the evidence and the parties' arguments, however, I do not adopt the Final Order wholesale.

A.     Free Appropriate Public Education

The IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

To determine if a student is denied a FAPE, "the court must engage in a two-step inquiry. First, the court must examine whether the State complied with the procedures set forth in the Act

---

[2]  This is the date alleged in the First Amended Complaint.  Plaintiffs' brief discusses other start dates.

and, second, whether the individualized educational program developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits." N.B. v. Hellgate Elementary Sch. Dist., 541 F.3d 1202, 1207 (9th Cir. 2008) (internal quotations omitted). A procedural violation denies a child a FAPE only when it "result[s] in the loss of educational opportunity or seriously infringe[s] the parents' opportunity to participate in the IEP formation process." R.B., 496 F.3d at 938 (internal quotation omitted) (improperly constituted IEP team was harmless procedural error because the excluded member testified at the hearing). Substantively:

> Some confusion exists in this circuit regarding whether the Individuals with Disabilities Education Act requires school districts to provide disabled students with "educational benefit," "some educational benefit" or a "meaningful" educational benefit. See, e.g., Hellgate, 541 F.3d at 1212-13. As we read the Supreme Court's decision in Rowley [Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 102 S. Ct. 3034 (1982)], all three phrases refer to the same standard. School districts must, to "make such access meaningful," confer at least "some educational benefit" on disabled students. See Rowley, 458 U.S. at 192, 200, 102 S. Ct. 3034. For ease of discussion, we refer to this standard as the "educational benefit" standard.

J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 951 n.10 (9th Cir. 2010).

Plaintiffs agree with the ALJ's conclusion that the District denied G.R. a FAPE from April 17, 2008, the date the District implemented an IEP on G.R.'s return from expulsion, until October 10, 2008, when the District completed a new IEP after G.R. enrolled in Provo Canyon School. Plaintiffs take issue, however, with the ALJ's conclusions about the District's earlier conduct.

### 1.    December 14, 2007 Expulsion

The District held a Manifestation Determination in October 2007, suspended G.R. effective October 17, 2007, held an expulsion hearing on December 14, 2007, and formally reinstated G.R.'s

expulsion from January 23, 2008 through April 17, 2008.  During this period, the District offered

G.R. five hours of tutoring a week.

Plaintiffs argue that G.R. should not have been expelled because his wrongful behavior was

a manifestation of his disability.  They also claim that the Manifestation Determination was not made

in accordance with the law because the team did not include the appropriate members and the team

only addressed if G.R. was eligible for an IEP instead of whether his behavior was a manifestation

of his disability.  Plaintiffs concede that the Manifestation Determination, held in October 2007, is

arguably outside the two-year statute of limitations for the present due process hearing, filed on

December 8, 2009. 20 U.S.C. § 1415(f)(3)(C) ("within 2 years of the date the parent or agency knew

or should have known about the alleged action that forms the basis of the complaint").  They

contend, however, that because the expulsion hearing was held on December 14, 2007, within the

statute of limitations period, I can consider the problems with the Manifestation Determination

which resulted in the expulsion.

I disagree.  The parents signed the Manifestation Determination form, which contains the

conclusion that the conduct or behavior is not a manifestation of the student's disability, on October

18, 2007.  If the parents wanted an ALJ to address the determination, they should have sought a due

process hearing within two years.  Thus, I will not address their arguments about the Manifestation

Determination itself.

>       2.       October 23, 2007 IEP

I must also address how the IDEA statute of limitations affects arguments concerning the

October 23, 2007 IEP.  The two-year statute of limitations bars claims the parents should have

known about before December 8, 2007.  This IEP was put in place a few months earlier, but it

remained in effect until the April 2008 IEP.  I will consider claims based on the October 23, 2007 IEP arising after December 8, 2007.  This conclusion precludes most procedural violations alleged against the October 23, 2007 IEP.

Substantive deficiencies in the October 23, 2007 IEP may not become obvious for months after the IEP is put in place.  Specifically, the parents may not have been aware of substantive deficiencies until after the December 8, 2007 statute of limitations.  Accordingly, I will address the alleged substantive deficiencies.

a.    <u>IEP Team Members</u>

Plaintiffs argue that G.R.'s October 23, 2007 IEP was procedurally deficient because the meeting producing this IEP did not have the required IEP team members.  Plaintiffs contend that Parker could not have attended as G.R.'s special education teacher because he was neither G.R.'s special education teacher nor his special education provider.  Plaintiffs claim that this procedural violation of FAPE resulted in a loss of educational opportunity for G.R., as evidenced by his lack of credit and the stagnation of his Woodcock Johnson test scores.

The parents should have been aware of this alleged procedural violation as soon as the meeting took place, which is about two months prior to the statute of limitations bar.  Thus, the allegation is untimely and I decline to address it.

b.    <u>Tutoring During Expulsion</u>

Plaintiffs contend that the amount of tutoring the District offered between G.R.'s suspension on October 17, 2007 and return to school on April 17, 2008 was less than the minimum instruction time required by the state and had no provision for specially designed instruction to work toward G.R.'s IEP goals.  The hearing officer who reinstated the previous expulsion through April 16, 2008

Page 13 - OPINION AND ORDER

required instruction through the use of a tutor, not to exceed five hours a week, and offering a similar number of credits as G.R.'s scheduled courses prior to the expulsion.

The District notes the IDEA allows for discipline of disabled students, including expulsion, but the act requires delivery of special education services in another setting during the expulsion. The District argues the IDEA does not require it to provide the exact same services as before the expulsion. The District claims it used its discretion appropriately to provide G.R. special education services in the alternative setting of tutoring.

Because the Manifestation Determination Hearing concluded that G.R.'s behavior concerning J.S. was not a manifestation of his disability, the District may use the same disciplinary procedures as used with children who do not have a disability. 34 C.F.R. § 300.530(c). G.R. is entitled, however, to receive educational services to enable him to progress toward the goals in his IEP. The services may be at an alternative educational setting. 34 C.F.R. § 300.530(d)(1)(i) and (2). Plaintiffs provide no legal authority that Oregon's minimum instructional time regulation applies to expelled students.

During his expulsion, G.R. received three hours a week of one-on-one tutoring from Judy Stuck. She taught G.R. using a program called Corrective Reading that had been very successful with other students who had reading deficiencies. The District intended this tutoring to fulfil G.R.'s IEP special education requirements.

The District also offered G.R. five hours a week of tutoring in academics through Novanet, a credit recovery computer-based tutoring program administered by a licensed teacher. The student takes the same subject matter through Novanet that the student was enrolled in prior to the expulsion. The District considers five hours a week of tutoring through Novanet as the equivalent of a full week

of regular classroom time.  Parker spoke to the Novanet tutor about G.R.'s difficulty with reading and explained G.R. would need the tutor's support to work with a computer-based tutoring program.

On February 4, 2008, the Novanet tutor reported that a female student complained that G.R. made multiple inappropriate sexual comments to her in the classroom.  G.R. also missed several weeks of Novanet tutoring sessions in late February.

On February 20, 2008, the District held an IEP team meeting to address the problems.  G.R.'s mother reported he was struggling with the computer-based tutoring and did better in a small classroom setting or working one-on-one with a teacher.  She also informed the team that G.R. has been in counseling for years, had been working with a therapist since October 2007, and the parents were awaiting the results of a psychosexual evaluation.

G.R. returned to Novanet on March 3, 2008 but the tutor directed him to leave after a female student claimed G.R. made inappropriate sexual comments to her.  In addition, the tutor could not get G.R. to focus on his schoolwork and stop discussing the problems he was having with the school administration.  When the tutor decided that G.R. would not settle down and work that day, she asked him to leave.  About March 5, 2008, the District replaced the five hours of Novanet tutoring with five hours of one-on-one tutoring conducted by Stuck in math and language arts, in addition to the Corrective Reading program.

G.R.'s IEP required one hour a day for specially designed instruction in writing and math and three hours a week in reading tutoring.

During G.R.'s expulsion, the District offered him services which met the current IEP's requirement.  Stuck testified that G.R. made good progress in reading.  The District changed from the computer-based tutoring to a one-on-one tutor once it became clear that G.R. was not making

adequate progress with the computer and his mother provided more insight into his learning difficulties. In addition, G.R. skipped several weeks of school before this change, which contributed to a lack of progress on the computer.

I conclude that the District complied with all regulations in reinstating G.R.'s expulsion. It also complied with the IDEA by offering tutoring which met his IEP, and then changing the nature of the tutoring to improve G.R.'s progress once issues arose. There is no requirement that the District offer the minimum instruction time to expelled students. The District did not deny G.R. a FAPE in the manner it offered him tutoring during his expulsion.

c.    Credit During 2007/2008 School Year

Plaintiffs also note that G.R. received very little credit from the District during the 2007/2008 school year. They contend that the District did not begin calculating his credits for that school year until the parents notified the District on August 5, 2008 that they had retained counsel.

G.R. did not earn any credit from the computer-based tutoring. G.R. earned 1.5 credits when Stuck tutored him during the expulsion. She reported these credits by the end of the school year. The New Options report cards dated May 9 and June 3, 2008 showed G.R. earning 1.25 credits in the spring term. It appears he earned full credit for his six weeks of work at New Options, although his father was concerned that G.R. had not mastered the subject matter. On September 9, 2008, G.R.'s Academic Record from the District showed that he had earned 2.80 units in his freshman year of high school. In 2011, a standard diploma required 26.0 units. Thus, G.R. had earned less than half the credits needed to stay on track for graduating on time.

Also on September 9, 2008, Gartland sent an email to the various teachers and tutors asking them to record any credits G.R. earned the previous year. Gartland wanted to get all possible credits

recorded before sending G.R.'s transcript to Provo Canyon School.  Gartland explained that at times

credit for part of a term could be earned and G.R.'s credits had not been recorded because of his

change of placements due to his expulsion.

I disagree with plaintiffs' argument that Gartland started a search for credits when the District

learned that the parents had retained counsel.  The search was triggered by Provo Canyon's request

for a transcript.

Plaintiffs are correct that G.R. earned little credit during his freshman year in the District, less

than half of what he needed to stay on track for a diploma.  During this period, however, the District

suspended and then expelled G.R., keeping him out of regular classes for six months.  G.R. skipped

tutoring for several weeks in February 2008.  The District called an IEP meeting to address these

issues, as well as G.R.'s inappropriate behavior in the tutoring classroom.  Although the District

knew that G.R. read at the fourth grade level, Parker had warned the tutor for the computer-based

program that G.R. would need extra help to complete the work.  At the February 20, 2008 IEP

meeting, G.R.'s mother provided additional information that one-on-one tutoring would be more

effective.  When G.R. returned to school in early March, the District switched him from the

computer-based program to additional hours of tutoring with Stuck, who testified that he made good

progress.

The IDEA "does *not* guarantee the absolutely best or potential-maximizing education for the

individual child."  The District is to provide the "basic floor of opportunity."  R.B., 496 F.3d at 946

(internal quotation omitted).  I conclude that the District has done so here, even in light of the lack

of credits G.R. earned.  The District was dealing with G.R.'s continued improper behavior during

that school year, which did not improve after he was expelled.  The parents did not begin to share

the extent of G.R.'s psychological issues with District personnel until the IEP meeting on February 20, 2008, and even then were less than forthcoming.  The parents also changed position, first the mother agreeing on February 20, 2008 to share a psychosexual evaluation that was pending and then at some point before April 2, 2008, refusing to share the information after receiving it.  The parents did not promptly provide consent for the District to obtain its own evaluations.  As the District learned information, it made changes in the way it was educating G.R., even during the expulsion period.  The lack of credits, standing alone, does not demonstrate that the District denied G.R. a FAPE.

> d.    Educational Benefit

Plaintiffs argue that the October 23, 2007 IEP was substantively deficient because G.R. received no educational benefits during his entire time at the District.  Plaintiffs rely on G.R.'s standardized test scores not significantly changing between 2006 and 2008.

G.R. took the Woodcock Johnson III Tests of Achievement on October 10, 2006 (shortly after enrolling in the District in the eighth grade) and September 11, 2008 (after enrolling at Provo Canyon School).  His October 10, 2008 IEP states the following about his Broad Reading and Comprehension scores:  "This result is similar to where he was last year and levels reported by observation from his Corrective Reading teacher spring of 2008." S45 at 3.  In the twelve measures tested, G.R. advanced by as much as six months on three measures, declined a few months on two measures, and advanced an average of three months on all.  S45 at 3; S73 at 7.

As explained in the discussion above about the lack of credits G.R. earned during this period, the year included his expulsion, his additional behavior problems during tutoring, and the parents' lack of forthrightness concerning G.R.'s known psychological problems.  In spite of this, G.R. made

some progress documented by the Woodcock Johnson III.  I conclude that G.R. received an educational benefit from the October 23, 2007 IEP.

e.    Behavior Issues

Next, plaintiffs claim that the October 23, 2007 IEP is substantively deficient because it does not account for G.R.'s aberrant behaviors, states that his behavior does not impede his learning or the learning of others, and does not contain any behavioral goals or plan.  This is in spite of his suspension at the time.

This IEP was put in place a week after the Manifestation Determination concluded that G.R.'s conduct was not a manifestation of his disability.  At the IEP meeting, G.R.'s mother raised the possibility to Parker that G.R. had an undiagnosed behavior disorder.  Parker was unaware of prior discipline, for tobacco use and bringing a knife to class, because the discipline was not documented in G.R.'s IEP file.  At that time, Parker did not see a pattern indicating a behavior disorder because the behaviors were in different areas, namely tobacco use, possession of a small knife, and sexual misconduct.

Female students reported G.R. viewing pornography and making inappropriate sexual comments to them at school on December 11 and 19, 2007 and February 4, 2008.  Parker realized that a pattern was developing and called an IEP Team Meeting for February 20, 2008 to address the issue.  At that meeting, G.R.'s mother explained that G.R. had seen a psychiatrist for several years and the parents were waiting for the results of a psychosexual evaluation.  The team decided to use the results from that evaluation to determine if any other evaluations needed to be done.

IEPs are not evaluated retrospectively.  "We do not judge an [IEP] in hindsight; rather, we look to the [IEP's] goals and goal achieving methods at the time the plan was implemented and ask

whether these methods were reasonably calculated to confer [Student] with a meaningful benefit .
. . ." J.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 439 (9th Cir. 2010).

When the October 23, 2007 IEP was implemented, G.R.'s misconduct was very disconnected in nature and spread over a period of time.  Parker could not discern a pattern, even after G.R.'s mother raised a concern.  When additional misconduct began to form a pattern, Parker quickly convened an IEP Team Meeting.  The lack of a behavior plan in the October 23, 2007 IEP did not deny G.R. a FAPE.

3.    April 2008 IEP

In the April 2008 IEP, the ALJ concluded the District denied G.R. a FAPE.  The District contends that the ALJ provided a well-reasoned analysis which identified some flaws in the IEP but indicated that some educational benefits were provided to G.R. as well.  The District argues that the ALJ recognized G.R. earned passing grades and his teachers noticed progress academically and behaviorally.  Thus, the District argues that the court should uphold the ALJ's findings and legal analysis.  Plaintiffs disagree.

a.    IEP Team Members

Plaintiffs argue the April 2008 IEP was procedurally inadequate because the IEP team did not include all required members, namely G.R.'s parents.  Plaintiffs contend that Parker developed the IEP, provided it to District personnel to sign when G.R.'s parents were not available, and gave it to the parents as a final IEP.  The parents claim the District made no attempt to schedule the IEP meeting when they could attend and the placement change to the New Options program was made prior to the team meeting.

Parents of a child with a disability are part of the IEP team.  20 U.S.C. § 1414(d)(1)(B).  An

IEP meeting can be held without the parents if attempts are made to secure their attendance:

> (d)  Conducting an IEP Team meeting without a parent in attendance.  A meeting may be conducted without a parent in attendance if the public agency is unable to convince the parents that they should attend.  In this case, the public agency must keep a record of its attempts to arrange a mutually agreed on time and place, such as–
>
> (1)  Detailed records of telephone calls made or attempted and the results of those calls;
>
> (2)  Copies of correspondence sent to the parents and any responses received; and
>
> (3)  Detailed records of visits made to the parent's home or place of employment and the results of those visits.

34 C.F.R. § 300.322(d).  See Shapiro v. Paradise Valley Unified, 317 F.3d 1072, 1078 (9th Cir.

2003) (district violated IDEA when the parents asked to reschedule an IEP meeting and the district

refused to do so near the end of the school year, prioritizing its representatives' schedules over the

parents' schedules), superseded by statute on other grounds, M.L. v. Federal Way Sch. Dist., 394

F.3d 634, 645 (9th Cir. 2005).

On March 31, 2008, the district sent the parents a Notice of IEP Team Meeting on April 11,

2008 to review existing information about G.R. and develop or review an IEP and placement for

him.  G.R. was scheduled to return to school from his expulsion on April 17.  The notice gave a

person's name and phone number for the parents to contact if they could not attend or wanted to

discuss changing the time.  The notice warned that if the parents chose not to participate, the meeting

might be conducted without them.  It also explained the parents could provide information they

wanted considered as part of the meeting.  G.R.'s parents did not have a history of failing to attend IEP meetings.

On April 7, G.R. told his tutor, Stuck, that he and his mother were leaving town and they would not be able to attend the IEP meeting on April 11.  The information was given to Parker, who called G.R.'s father.  Parker believed that the father approved the rest of the team meeting without the parents, and Parker and the father agreed to meet the following week, just before G.R. returned to school.

There is no evidence that G.R.'s parents asked to reschedule the April 11 IEP team meeting. There is no evidence that the parents directly contacted any of the other team members or District administration to let the team know that they could not attend.  I acknowledge testimony from G.R.'s father that he would not approve holding an IEP team meeting without a parent present, but I accept the ALJ's decision to find Parker's testimony more persuasive.  Contemporaneous notes and emails corroborate Parker's testimony.

Thus, the record shows:  (1) Parker contacted the parents after G.R. told his tutor the family was going out of town; (2) Parker got the father's permission for the team to meet without the parents; (3) G.R. was returning to school less than a week after the scheduled meeting time and had expressed to his tutor his fear of returning to the general high school population; and (4) Parker arranged to meet with the father the following week, immediately before G.R. returned from his expulsion.

The District did not violate the IDEA by holding this IEP team meeting without the parents. Time was of the essence in discussing placing G.R. in New Options on his return to school.  The

Page 22 - OPINION AND ORDER

parents did not ask to reschedule the meeting.  The District acted within the IDEA by holding the IEP meeting as scheduled and then meeting with the parents the following week.

        b.      <u>Educational Benefit–Present Levels of Academic Achievement and Functional Performance ("PLOP")</u>

Plaintiffs contend the April 2008 IEP was substantively deficient because it was not reasonably calculated to provide G.R. a meaningful educational benefit.  Specifically, plaintiffs argue the PLOP documents several behavioral issues resulting in G.R.'s expulsion but the IEP does not indicate that the team considered his behavior a factor in the learning of G.R. or others.

The April 2008 IEP contains two behavioral goals which include measurable short-term objectives and two social emotional goals with measurement methods.  The PLOP discussion also contains information about G.R.'s behavioral issues and notes that additional evaluations are underway.  It is true that neither "yes" nor "no" is checked for the question, "Does the student exhibit behavior that impedes his [or] her learning or the learning of others?"  S46 at 2.  The IEP instead addresses G.R.'s behavior problems with a plan on how to address it.  Any error in failing to check the box is de minimis.

        c.      <u>Educational Benefit–Sufficient Credits for Graduation</u>

The April 2008 IEP projects that G.R. would graduate with a regular diploma in 2011 even though he had received little credit for the entire 2007/2008 school year and remained at an elementary level for reading and math.  Plaintiffs argue this demonstrates the substantive deficiency of the IEP.

When this IEP was implemented, G.R. had earned 1.5 units in the fall semester as a result of Stuck's tutoring.  He did not earn any credits through Novanet tutoring and had not yet started at

New Options. In sum, G.R. was well behind in credits if he wished to graduate on time with a regular diploma, as stated in the April 2008 IEP. The IEP was implemented half way through the second semester of G.R.'s freshman year, however, so he had more than three years to make up the lost work.

Ryan Opp, a special education teacher and counselor in the New Options program, testified that he had seen several students enter New Options with very few credits and make huge strides in the program. Opp attributed their success to the program removing stress the students felt that was associated with their misbehavior. Less stress allowed the students to focus on academics. Opp also explained that he teaches all subjects in front of the classroom because New Options was not a computer-based curriculum, something known to be an ineffective teaching method for G.R. Further, New Options uses a grading period which is half as long as the regular school calendar. The shorter grading period would allow G.R. to earn some credits for that term after entering in the middle of the semester.

Although G.R. was well behind when the team put the April 2008 IEP in place, the New Options program had several characteristics which could allow G.R. to meet the goal of an on-time graduation with a regular diploma. Plaintiffs have not shown that the goal was impossible or even unlikely. I find that the graduation goal does not demonstrate the substantive deficiency of the April 2008 IEP.

    4.    <u>June 2008 IEP</u>

Plaintiffs contend that the June 2008 IEP was invalid because it was only a draft, was unsigned, and had nearly all the same procedural and substantive defects as the earlier IEPs.

Although an IEP team met on June 4, 2008 to review G.R.'s placement in the fall of 2009, the team only discussed a draft IEP and did not adopt it. The team wanted to wait for evaluations to be completed. Moreover, G.R.'s father expressed some concerns at the meeting which the team wished to consider further. Because no formal IEP was adopted in June 2008, I find that it had no substantive defects. The ALJ found no procedural defects for the April 2008 IEP which could have affected the June 2008 IEP. Moreover, as I concluded above, I found no further procedural defects for the April 2008 IEP. In sum, I find no IDEA violations associated with the June 2008 IEP.

B.    Reimbursement for Private Residential Placement

Plaintiffs contend the ALJ erred by failing to require the District to reimburse them for G.R.'s private residential placement at Provo Canyon School from September 1, 2008 through August 21, 2009.

"'[C]ourts may grant reimbursement under § 1415(i)(2)(C)(iii) only when a school district fails to provide a FAPE *and* the private-school placement is appropriate.'" R.J., 588 F.3d at 1009 (quoting Forest Grove Sch. Dist. v. T.A., __ U.S. __, 129 S. Ct. 2484, 2493 n.9 (2009)). If "the private-school placement is a residential facility, the placement is appropriate only if it is 'necessary to provide special education and related services.'" Id. (quoting 34 C.F.R. § 300.104) (an internal quotation omitted). The court should focus on whether the residential placement is necessary for educational purposes, as opposed to being a response to medical, social, or emotional problems. Id. at 1010. In addition, the court retains the discretion to make equitable reductions to the amount of a reimbursement award for such things as inadequate notice from the parents of a decision to enroll the child in a private school. Ashland Sch. Dist. v. Parents of Student E.H., 587 F.3d 1175, 1183 (9th Cir. 2009).

> "*To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential.* They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction."

C.B. v. Garden Grove Unified Sch. Dist., 635 F.3d 1155, 1159 (9th Cir. 2011) (quoting and adopting standard in Frank G. v. Bd. of Educ., 459 F.3d 356, 365 (2d Cir. 2006)) (reimbursement was appropriate, even though the private school could not instruct the student in arithmetic, because the school delivered many, but not all, special education services the student required), pet. for cert. filed, No. 11-174, 80 U.S.L.W. 3090 (Aug. 8, 2011).

There is no dispute that the District failed to provide a FAPE from April 17, 2008 until October 10, 2008. G.R. enrolled at Provo Canyon School on September 1, 2008 and attended for a full calendar year. The issue before me is whether Provo Canyon School was an appropriate placement.

Plaintiffs claim the ALJ erred when he concluded that Provo Canyon School did not have an IEP for G.R. Plaintiffs note that as a private school, Provo Canyon School is not governed by the IDEA and is not required to develop a formal IEP. Instead, Provo Canyon School adopts IEPs from the child's prior school district and performs additional evaluations when the child arrives.

The parents are correct that a private school does not have to meet the technical requirements of the IDEA. Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 (6th Cir. 2003) (statutory requirements of a FAPE do not apply to private school placements). For parents to be entitled to reimbursement, however, the private school placement must offer the child "an education otherwise proper under [the] IDEA." Id. (internal citation omitted).

Page 26 - OPINION AND ORDER

Plaintiffs contend the District failed to evaluate G.R. properly until his parents gave notice of private placement.  They argue they should not be denied reimbursement for private placement because of the District's malfeasance.  According to plaintiffs, the District has the responsibility to evaluate children for suspected disabilities.

The District claims it could not have been aware that G.R. needed to be evaluated for possible behavioral or emotional disabilities until February 20, 2008, and that the delay in asking for consent until March 5, 2008 was reasonable.  The District also notes that the parents did not provide consent for the evaluation until April 16, 2008, so the court should attribute all delay to the parents.

The parents requested a behavioral evaluation of G.R. on October 23, 2007, after the IEP meeting.  The District raised the issue for discussion in February 2008.  Until that time, G.R.'s misconduct did not follow a pattern that would have alerted the District to the need for a behavioral evaluation.

The parents requested an education evaluation in March 2008.  The District provided a consent form on March 5, 2008, the parents returned the consent on April 16, 2008, and the District began the evaluations shortly thereafter.

I agree with the ALJ that the parents were not forthright with the District concerning the severity of G.R.'s mental health issues.  In particular, the parents did not provide input from G.R.'s therapist or even inform the District that G.R. had been seeing therapists for several years who diagnosed him with bipolar disorder, ADHD, attachment disorder, post traumatic stress disorder, and depression.  The parents' refusal to share G.R.'s psychosexual evaluation with the District is another example of keeping information from the District.  This conduct impairs the District's ability to make the best determination rapidly of what evaluations of G.R. it needs to obtain.  The parents also

delayed for over a month in providing one of the consents. Most importantly, any delay on the District's part which was not caused by the parents does not persuade me that G.R.'s private placement at Provo Canyon School is necessary for educational purposes. I am unaware of any tests results Provo Canyon School obtained which caused the school to modify its educational plan for G.R.

Next, I will review the evidence most relevant to the reimbursement issue.

Richard Robison, Polk County's lead Juvenile Probation Officer, who supervises all adolescent sex offenders, testified at the due process hearing that there are about ten out-patient sex offender treatment providers in Salem, Oregon and numerous residential programs in Oregon. Robison was familiar with the providers on the list and had worked with them all. Families may select a sex offender treatment provider which is not on Robison's list if Robison speaks to the provider and concludes that the treatment would thoroughly address the youth's issues. Provo Canyon School was not on Robison's list.

Robison spoke to the clinical director at Provo Canyon School and confirmed that the school contracted with an outside provider to offer at the school sex offender treatment which met Robison's standards. Provo Canyon School sent Robison thorough monthly reports about G.R. Robison would not have required residential treatment for G.R., but Robison viewed the family's offer as going above and beyond the norm to provide for G.R.'s needs. Robison believed G.R. could have continued to obtain his education at Dallas High School while taking part in a local out-patient sex offender treatment program. He also believed it was important that G.R.'s plan include an educational component. In Robison's opinion, G.R. received an adequate education at Provo Canyon School as well as sex offender treatment and counseling on his general behavior. Robison

Page 28 - OPINION AND ORDER

is unaware of IDEA requirements, however, and did not know of any special education requirements G.R. had.  Robison also clarified that his definition of an adequate education concerned supervision of the youth and not the content of the education.

Dr. Senn performed the psychosexual evaluation of G.R. referenced by the Juvenile Court. He believed that Provo Canyon School had an all-encompassing program that dealt with G.R.'s sexual battery needs, emotional needs, and educational needs.

Wade Taylor was G.R.'s therapist at Provo Canyon School.  In Taylor's opinion, G.R.'s issues were pervasive enough that he would have trouble succeeding in a self-contained classroom like New Options.  Taylor knew that New Options would be more of a one-on-one setting but he did not know what professionals were available to the students.   Taylor testified that G.R. struggled for the first six months at Provo Canyon School and then showed steady improvement.

Dr. Whitaker is a school psychologist with the Salem-Keizer School District who also provides services to the Dallas School District.  He spends more than half his time facilitating the Sexual Incident Response Committee, which provides consultation to schools on how to manage kids with sexual misconduct problems.  To prepare for testifying as an expert at the due process hearing, Dr. Whitaker reviewed reports about G.R. drafted by Dr. Senn, by the school psychologist, Carmel Hanes, and by G.R.'s former school in Wisconsin.  Dr. Whitaker observed the New Options classroom for two hours and reviewed the treatment records provided by Provo Canyon School, a summary of events from the District, and G.R.'s mental health records from three treating therapists.

In Dr. Whitaker's opinion, G.R.'s misconduct required additional supervision which Dr. Whitaker thought could be done in a mainstream school environment without resorting to a self-contained classroom.  Alternatively, Dr. Whitaker thought G.R.'s issues could be addressed in a self-

contained classroom like New Options, where Dr. Whitaker believed that G.R. would do well, particularly in its social skills group training. Dr. Whitaker outlined several risks of putting G.R. in a residential placement like Provo Canyon School: (1) exposure to students who had displayed worse sexual misconduct than G.R. would increase his knowledge of inappropriate sexually maladaptive behavior than he had before the placement; (2) G.R.'s history of emulating the behavior of others to develop a social connection with them would cause him to adopt a host of inappropriate behaviors and worsen his sexual misconduct issues; and (3) G.R.'s files from Provo Canyon School indicates that when there, he engaged in more serious, more developmentally inappropriate, and more deviant behavior than he engaged in before the placement.

G.R.'s mother testified they placed G.R. in Provo Canyon School because he could get an education there, the school had the expertise to help G.R. focus on behavior issues, and the school provided a lot of guidance and supervision. The parents rejected some other schools because the teachers were brought in from outside, the learning was computer-based, or the student-teacher ratio was too high. G.R.'s father testified they selected Provo Canyon School because it was accredited so that G.R. could make progress towards a regular, not a modified, high school diploma.

In an IEP meeting on October 6, 2008, after G.R. enrolled in Provo Canyon School, his parents, lawyer, and the IEP team discussed the different placement options and their effect on G.R.'s criminal charges.

At the IEP team meeting on October 10, 2008, several representatives from Provo Canyon School took part by phone. They believed that G.R. would not be successful in a nonresidential setting because of his risk of behavior that could result in another expulsion. They also believed that Provo Canyon School provided a structured learning environment with a lot of one-on-one

Page 30 - OPINION AND ORDER

instruction from which G.R. benefitted.  The representatives from the District all believed that G.R. could be successful in the less restrictive New Options program coupled with third-party sex offender treatment.

Parker, G.R.'s special education case manager, testified that he did not think residential placement was appropriate for G.R. because Parker did not see any evidence that G.R. needed to be taken out of his home.  Parker was concerned that placing G.R. in a near locked-down placement would be more punishing than positive for G.R.'s behavioral issues.  Parker was also concerned that G.R. could not learn appropriate social boundaries with female students in Provo Canyon School's segregated campus.  In Parker's opinion, G.R. could return to New Options, with the Polk Adolescent Day Treatment Center as a backup plan if G.R. needed a more restrictive placement.  Parker believed that New Options could implement the same behavioral program for G.R. as the one at Provo Canyon School.

Dr. MacKendrick became G.R.'s treating psychologist in October 2007, after G.R. was accused by J.S.  The doctor testified that the smaller classroom at New Options with a teacher, counselor, and aide would be helpful to G.R., but he did not know enough about the program to know if it had group training to improve G.R.'s behavioral interpersonal skills.  Based on G.R.'s performance in New Options in the spring of 2008, Dr. MacKendrick thought G.R. would continue to fail in that environment if it did not have group interpersonal behavioral work as part of the program.  Dr. MacKendrick testified that it would have been helpful to speak with District personnel about G.R. but the parents never signed a release for him to do so.

Ryan Opp, G.R.'s special education teacher in New Options, testified that G.R. was doing well in New Options and could have continued in the fall of 2008.  Opp did not think G.R. needed

a locked-down facility, and he thought that the corrections and redirections G.R. received during his six weeks in New Options were starting to work to improve his behavior and his ability to form appropriate peer relationships.

G.R.'s IEP team continued to meet after G.R. transferred to Provo Canyon School because the District expected G.R. to return. On September 26, 2008, the IEP team concluded that G.R. was eligible for services as emotionally disturbed. The October 10, 2008 IEP included a great deal more information about G.R.'s behavioral issues than the previous IEPs and specifically noted that he exhibited behavior that impeded his learning and the learning of others.

I now turn to some of the arguments the parties raise about whether the parents are entitled to reimbursement for the private placement.

The District argues the parents are not entitled to reimbursement because they chose Provo Canyon School, at least in part, for legal purposes to provide a sex offender program for G.R. The parents agree with the ALJ's decision that G.R. did not attend Provo Canyon School to participate in sex offender treatment as part of his plea agreement.

I agree with the District. Although the plea bargain did not require G.R. to attend Provo Canyon School in particular, it clearly required him to have a year of sex offender treatment if the charges were ultimately to be dismissed. The IEP team, including the parents and their lawyer, discussed the effect of the different placements on G.R.'s criminal charges. Juvenile Probation Officer Robison was in contact with Provo Canyon School and approved what it would offer for sex offender treatment. I do not think G.R. would have attended Provo Canyon School if he could not complete the sex offender treatment requirement while there. I also believe, however, that this is not the sole reason his parents chose the school. They were clearly quite concerned about his lack of

Page 32 - OPINION AND ORDER

credits and behavior issues. Thus, I do not think my conclusion on this point requires me to deny reimbursement for the residential placement.

Plaintiffs contend they are entitled to reimbursement because Provo Canyon School was an appropriate placement for G.R. They argue that G.R. was exhibiting troubling behaviors in school which directly affected his ability to learn. The parents claim they placed G.R. at Provo Canyon School for educational and behavioral purposes. They note G.R.'s lack of credit and stagnation of his Woodcock Johnson test scores while still at the District. The parents contend the evidence shows that circumstances had deteriorated to the point where G.R. could no longer be successful in the District's only program for him–New Options. They note that G.R. flourished, both at Provo Canyon School and later at Highland High School, a public school in Salt Lake City.

The District claims the parents were unable to demonstrate any educational need for the residential placement. The District relies on the testimony of Dr. Whittaker, the School Psychologist, who opined that the placement would likely end up harming G.R. According to the District, none of the educational professionals supported a residential treatment placement for G.R.

The record reflects that New Options is a highly structured program with small class size, close supervision and daily tracking, behavioral supports, and individual and group therapy. Because it has both sexes in the classroom, New Options would have given G.R. the ability to practice appropriate behavior with teenage girls, his most serious behavioral issue. The segregated program at Provo Canyon School did not offer this learning opportunity. New Options was also less restrictive than Provo Canyon School, an important consideration for a high school student who would be leaving the classroom environment in a few years and must learn to get along with peers. Additionally, New Options allows students to spend part of the day in the mainstream classrooms

Page 33 - OPINION AND ORDER

and take part in sports and more varied educational activities, once they show the ability to cope in the mainstream environment.  In the opinion of Robison, Dr. Whitaker, Parker, and Opp, New Options was an appropriate placement for G.R.  I am also highly persuaded by Dr. Whitaker's opinion that placement at Provo Canyon School had the risk of exacerbating G.R.'s sexual misconduct issues because most of its students had far more serious problems than G.R.

I carefully considered the opinion of Dr. MacKendrick, G.R.'s latest treating psychologist, that G.R. would continue to fail in New Options.  Dr. MacKendrick was not aware New Options had group therapy designed to help with behavioral issues.  I also put weight on the fact that on September 26, 2008, the IEP team found that G.R. was eligible for services as emotionally disturbed and supplemented his IEP to deal with his behavioral issues.  Although G.R. had ongoing misconduct in the six weeks he spent at New Options in the spring of 2008, I note it took him six months to adjust and start to improve at Provo Canyon School.

Based on all the evidence, I find G.R. would have received an appropriate education if he continued at New Options.  Accordingly, I conclude that placement at Provo Canyon School was not necessary to provide special education and related services.  Thus, the private-school placement was not appropriate, as defined by the case law, and I do not award plaintiffs reimbursement for G.R.'s placement there.

C.    Compensatory Education

The ALJ found:  (1) the parents hid G.R.'s mental health and behavior problems in school; and (2) Provo Canyon School and the Salt Lake City School District had both assessed G.R. after he left the District.  Balancing these points, the ALJ concluded it would not be equitable to require

the District to perform additional assessments and testing of G.R. to make up for the prior failure to do so.

Plaintiffs claim the ALJ erred by failing to award compensatory education. They dispute the ALJ's conclusion that they withheld information from the District when they enrolled G.R. in 2006. According to the parents, if the District had properly obtained G.R.'s prior records, the District would have known of his behavioral issues.

Plaintiffs seek 624 hours of compensatory education for the 2007/2008 school year. They calculate the number of hours by considering the amount of schooling G.R. missed during his expulsion, the amount of special education and general education tutoring the District offered him during the expulsion but did not actually provide, and the annual amount of instruction the State of Oregon requires for high school students, with no exception for expulsions. Plaintiffs then look at the salary a starting school teacher earns at the District and the amount paid per hour for a private tutor to arrive at a rate of $45 per hour. Plaintiffs multiply this rate by the 624 hours, for a compensatory education award of $28,080. Plaintiffs give no explanation of what services they need to obtain for G.R. to put him in the position he would have been in if the District had complied with the IDEA.

The District argues the ALJ correctly decided not to award compensatory education. The District claims the record supports the ALJ's findings that the parents repeatedly and deliberately hid important information from the District and G.R. received some educational benefit under the IEP. The District argues that plaintiffs' calculations make no sense when considering an equitable remedy because G.R.'s specific need for baseline data was addressed at other schools after he left the District. The District also contends the IDEA statute of limitations bars any compensatory

education before December 8, 2007 and the court should not award compensatory education for the time during G.R.'s expulsion.

I decline to address the statue of limitations issue because I conclude that plaintiffs are not entitled to a compensatory education award at all.

"Compensatory education is an equitable remedy that seeks to make up for 'educational services the child should have received in the first place,' and 'aim[s] to place disabled children in the same position they would have occupied but for the school district's violations of IDEA.'" R.P. v. Prescott Unified Sch. Dist., 631 F.3d 1117, 1125 (9th Cir. 2011) (quoting Reid v. Dist. of Columbia, 401 F.3d 516, 518 (D.C. Cir.2005)). Courts can award prospective educational services to compensate for past deficiencies, including special programs, extended instruction beyond the ordinary limit of IDEA coverage at age twenty-one, or additional training for the student's teachers. Reid, 401 F.3d at 522; R.P., 631 F.3d at 1126.

The District of Columbia Circuit refused to adopt a "cookie-cutter approach" for determining a compensatory award based on the presumption that each hour without FAPE entitled the student to one hour of compensatory instruction. Reid, 401 F.3d at 523. Noting that a compensatory award is a form of equitable relief and not a contract remedy, the Ninth Circuit reasoned there is no obligation to provide a "day-for-day compensation for time missed. Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." Parents of Student W v. Puyallup Sch. Dist. 3, 31 F.3d 1489, 1497 (9th Cir. 1994) (district court did not abuse discretion in refusing to award one and one-half years of compensatory education because student graduated from high school before reaching age 21 without any services in addition to those provided in the IEP).

At oral argument, plaintiffs' counsel clarified that plaintiffs are not asking for a compensatory education award in the form of injunctive relief because G.R. graduated from high school in Salt Lake City in the spring of 2011, at the age of 19. G.R.'s graduation, however, demonstrates why I am not awarding any compensatory education. G.R. graduated from high school and earned a standard diploma rather than a modified diploma. He accomplished this without any additional educational services to make up for the District's denial of a FAPE due to a lack of assessments. Plaintiffs have not suggested any educational services which would assist G.R. as he begins his community college education. They do not seek additional assessments or testing. There is no proof of any areas in which G.R. is lacking because of the past denial of a FAPE. The opposite appears to be true. G.R.'s father listed numerous awards G.R. earned at high school in Salt Lake City, where he transferred after attending Provo Canyon School for a year.

In sum, I will follow the law as stated in R.P. I see no need for an equitable remedy in the form of injunctive relief and decline to award any compensatory education. I do not address the reason given by the ALJ for refusing to award compensatory education because there is no need to balance the equities of the parents' conduct and the need for additional assessments and testing of G.R.

III.    Tort Claims

    A.    Negligence Per Se Claim

Plaintiffs allege that the District was negligent per se by breaching the duties specified in ORS 326.575, concerning obtaining educational records when a student transfers to an Oregon public or private school, and ORS 419A.255, concerning the confidentiality of juvenile court records.

The District moves for summary judgment dismissing both parts of the negligence per se claim.

    1.    <u>ORS 326.575</u>

The District maintains that after G.R. enrolled for fall term of 2006, it requested records from his last school in Wisconsin and received them in August 2006. The District argues there is no evidence that it did not request the records in a timely manner.

Plaintiffs claim that the District cannot shift the responsibility of obtaining prior school records to the parents. According to plaintiffs, the District did not ask for G.R.'s records from Wisconsin until May 2008. Thus, plaintiffs argue that the factual issue must be resolved at trial.

ORS 326.575(1) states: "Within 10 days of a student's seeking initial enrollment in a public or private school . . . , the school . . . shall notify the public or private school . . . in which the student was formerly enrolled and shall request the student's education records."

At the due process hearing, Carla Koepp, administrator at Lake Country Academy, G.R.'s prior school in Wisconsin, testified that the District never requested G.R.'s records. On cross examination, counsel asked Koepp about a 35 page fax Lake Country Academy sent on August 31, 2006 concerning G.R. Koepp then remembered that she sent G.R.'s records in that fax. Barbara Fawns, who worked at G.R.'s middle school at the District, testified that she received records for G.R. when he enrolled at the school, reviewed them, and decided that they were incomplete when compared to Oregon's rules concerning special education. Receiving incomplete records was not unusual because the rules varied from state to state.

To survive summary judgment, plaintiffs must demonstrate that a factual issue exists on whether the District violated the statute. Plaintiffs cannot do so based on Koepp's testimony because

she admitted sending G.R.'s records when counsel refreshed her memory by discussing the fax that had the records attached.  Fawns corroborates Koepp's testimony because Fawns remembers receiving the records.  ORS 326.575 requires the District to request a new student's records.  The District is not responsible if the records sent are incomplete.  All it can do is start filling in the missing information by obtaining new consent forms and evaluations, which is what the District did here.

I conclude that no reasonable jury could find in plaintiffs' favor on the negligence per se claim based on a violation of ORS 326.575.  Accordingly, I grant summary judgment and dismiss the claim.

2.    ORS 419A.255

The District subpoenaed G.R.'s juvenile court file to be delivered to the ALJ.  At the due process hearing, the ALJ discussed whether to admit the documents.  She examined each document in camera and discussed with counsel the privilege provided by ORS 419A.255, waiver of the privilege, and the relevance of the document.  The District's counsel made her argument based on general descriptions of the documents as stated by the ALJ; counsel had never seen the documents. The ALJ ultimately admitted redacted portions of D315, the Judgment:  Jurisdiction of the Juvenile Court, and D316, the Petition Admitting Allegations that Youth is within the Jurisdiction of the Court.  The ALJ declined to address several other documents, such as the psychosexual evaluation and the Provo Canyon School monthly treatment plan reviews, because she already had admitted those documents after they were obtained from other sources.  It appears that additional undescribed documents were also provided as part of the juvenile file but not admitted.  Richard Robison, lead Juvenile Probation Officer with Polk County Juvenile Department, testified that his supervisor

conferred with County Counsel David Doyle and then delivered a copy of the juvenile court file to the ALJ. There is no evidence a juvenile court judge gave permission for the file to be provided under the subpoena.

The parties filed cross motions for partial summary judgment of liability on the negligence per se claim based on ORS 419A.255.

The District seeks to dismiss the claim and argues that the statute expressly allows the superintendent or his designee to obtain the juvenile record and, furthermore, only prohibits use of the records to impose civil or criminal liability against the child. Because the District used the records in the due process hearing to defend against the IDEA claims, the District contends that it did not use the records to impose liability against G.R. Specifically, the District claims it used the records to prove the parents did not place G.R. at Provo Canyon School for an educational purpose, but instead chose the school to comply with the plea bargain's requirement to participate in a sex offender program.

Plaintiffs argue the District violated this statute when it subpoenaed G.R.'s juvenile court records for use in the due process hearing, which plaintiffs characterize as a civil proceeding falling within the protection of the statute. Plaintiffs contend that juvenile records can only be disclosed on the request of the child or the consent of the juvenile court, neither of which was obtained with the District's subpoena. Plaintiffs acknowledge the language in ORS 419A.255 limiting its protection to "any proceeding to establish criminal or civil liability against the child." They contend that the District's use of the records made G.R. and the parents liable for the costs of his private residential placement and the costs of this litigation. Plaintiffs also rely on the general policy of confidentiality for juvenile court proceedings so that the rehabilitation of the child is not impeded.

They claim that the District's use of G.R.'s juvenile court records in an administrative proceeding

violates the purpose of the statute and offends the principles on which the juvenile justice system is

based.

ORS 419A.255[3] states, in relevant part (emphasis added):

> (2)  Reports and other material relating to the . . . youth offender['s] history and prognosis are privileged and, except at the request of the . . . youth offender, may not be disclosed directly or indirectly to anyone other than the judge of the juvenile court, those acting under the judge's direction, service providers in the case and the attorneys of record for the . . . youth offender or the . . . youth offender['s] parent [or legal parental substitutes]. *Reports and other material relating to a youth offender's history and prognosis in cases under ORS 419C.005 [Juvenile Code: Delinquency, Jurisdiction] may be disclosed to the superintendent of the school district in which the youth offender resides or the superintendent's designee.* The service providers in the case, school superintendents, superintendents' designees and attorneys are entitled to examine and obtain copies of any reports or other material relating to the . . . youth offender's history and prognosis.  Any service provider in the case, school superintendent, superintendent's designee or attorney who examines or obtains copies of such reports or materials is responsible for preserving their confidentiality.  A service provider, school superintendent or superintendent's designee who obtains copies of such reports or materials shall return the copies to the court upon the conclusion of the service provider's, superintendent's or superintendent's designee's involvement in the case.

> (3)  Except as otherwise provided in subsection (7) of this section [information indicating a clear and immediate danger], *no information appearing in the record of the case or in reports or other material relating to the . . . youth offender's history or prognosis may be disclosed to any person not described in subsection (2) of this section without the consent of the court*, except for purposes of evaluating the . . . youth offender's eligibility for special education as provided in

---

[3]  As of the time of the due process hearing, G.R. was a "youth offender," as defined by ORS 419A.004(37):  "'Youth offender' means a person who has been found to be within the jurisdiction of the juvenile court under ORS 419C.005 for an act committed when the person was under 18 years of age."  To simplify reading the statute, I have replaced its references to "child, ward, youth or youth offender" with a reference to "youth offender."

The statute as quoted was enacted by the Oregon Legislature during a Special Session in February 2008 to add the language concerning the "superintendent's designee."  The amendment was effective on January 1, 2009, well before the due process hearing in April 2010.

ORS chapter 343, and *no such information may be used in evidence in any proceeding to establish criminal or civil liability against the . . . youth offender*, whether such proceeding occurs after the . . . youth offender has reached 18 years of age or otherwise, except for the following purposes:

    (a)  In connection with a presentence investigation . . . .

    (b)  In connection with a proceeding in another juvenile court . . . .

. . . .

    (5)   Notwithstanding any other provision of law, the following are not confidential and not exempt from disclosure:

    (a)  The name and date of birth of the . . . youth offender;

    (b)  The basis for the juvenile court's jurisdiction over the . . . youth offender;

    (c)  The date, time and place of any juvenile court proceeding in which the youth or youth offender is involved;

    (d)   The act alleged in the petition that if committed by an adult would constitute a crime if jurisdiction is based on ORS 419C.005;

    (e)  That portion of the juvenile court order providing for the legal disposition of the . . . youth offender when jurisdiction is based on ORS 419C.005;

    (f)  The names and addresses of the . . . youth offender's parents or guardians; and

    (g)  The register described in ORS 7.020 when jurisdiction is based on ORS 419C.005.

I first note that plaintiffs' policy argument about the purpose for the confidentiality of juvenile court records is unpersuasive in a negligence per se claim.  The claim must rest on the protection provided by the statute and nothing more.

The alleged violation of ORS 419A.255 is a matter of statutory interpretation.  The parties do not dispute the facts.  I conclude as a matter of law that the District did not violate ORS 419A.255

Page 42 - OPINION AND ORDER

by subpoenaing G.R.'s juvenile court file to be delivered to the ALJ for use at the due process hearing. I come to this conclusion for the reasons that follow.

Under subsection (2), the statute allows disclosure of "reports and other material relating to a youth offender's history and prognosis" to the designee of the superintendent of the school district. The District's counsel is clearly a person within this provision and is entitled to the disclosure. Subsection (2) also requires the designee to maintain the confidentiality of these materials. The District's counsel never even had possession of the file. To maintain as much confidentiality as possible, counsel had the records sent straight to the ALJ, who reviewed them in camera to come to preliminary conclusions on what was relevant and what was not privileged under subsection (5). Before admitting D315 and D316, the ALJ heavily redacted the exhibits to delete material which retained the privilege under subsection (5) or was not relevant to the particular issue. The other documents in the file were not disclosed at the hearing unless they were obtained from other sources. The District did not violate ORS 419A.255 by this conduct.

Moreover, I agree with the District that it did not use this material to establish civil or criminal liability against G.R., as discussed in subsection (3). I am unpersuaded by plaintiffs' argument that the parents' possible liability for the Provo Canyon School tuition is the establishment of civil liability against G.R. There is no evidence that G.R. was personally liable for the tuition or old enough to enter into a contract during his stay at Provo Canyon School.

In sum, I find that the District did not violate ORS 419A.255, and I grant summary judgment and dismiss the negligence per se claim based on that statute.

B.      Intentional Infliction of Emotional Distress

Plaintiffs allege the District intentionally inflicted emotional distress on them by obtaining G.R.'s juvenile court records.

The District moves to dismiss this claim by arguing that there is no evidence that it extraordinarily transgressed the bounds of socially tolerable conduct by obtaining G.R.'s juvenile court records.

The tort of intentional infliction of emotional distress contains the following elements:

(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.

McGanty v. Staudenraus, 321 Or. 532, 543, 901 P.2d 841 (1995).

"It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so.  Where reasonable [persons] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability."

House v. Hicks, 218 Or. App. 348, 358, 179 P.3d 730 (2008) (quoting Restatement (Second) of Torts § 46 cmt. h (1965)).

I concluded above that the District did not violate ORS 419A.255.  I believe that the statute reflects what is socially tolerable.  Because there is no violation, the District's conduct did not constitute an extraordinary transgression of the bounds of socially tolerable conduct.  Accordingly, I grant summary judgment and dismiss plaintiffs' claim for the intentional infliction of emotional distress.

C.    Deceit

Plaintiffs allege that the District deceived them when District employee Green obtained a statement from J.S., the student victim of G.R.'s criminal charge, and then produced a harassment complaint form six weeks later which was not in J.S.'s handwriting or signed by J.S. Green testified at the due process hearing that J.S. signed the harassment complaint form.

The District contends the deceit claim is untimely and moves for summary judgment dismissing it. The District argues that plaintiffs learned of the alleged deceit when Green presented the documents at G.R.'s expulsion hearing in December 2007. The District notes that plaintiffs neither filed a tort claim notice within 180 days nor filed this action within two years of learning of the deceit.

Plaintiffs contend they did not know of Green's deceit until April 2010, shortly before the due process hearing. They offered J.S.'s declaration to the ALJ to refute Green's testimony, but the ALJ would not admit the declaration because of surprise. Thus, plaintiffs argue this was sufficient notice to satisfy the Oregon Tort Claims Act ("OTCA") and was within 180 days of plaintiffs learning of the deceit.

The OTCA requires notice within 180 days of the alleged loss or injury. ORS 30.275(2)(b). The required notice may be a formal notice or actual notice. Plaintiffs did not give formal notice. Under the Act, actual notice may be any communication "such that a reasonable person would conclude that a particular person intends to assert a claim" against the employee. ORS 30.275(6).

Plaintiffs' counsel argued to the ALJ that she should admit J.S.'s declaration because it was relevant to the bias Green and the District as a whole held against G.R. This argument, made at the due process hearing, is not sufficient to put a reasonable person on notice that plaintiffs intended to

assert a deceit claim against Green in federal court. I conclude that plaintiffs failed to give the notice required by the Act.

I am also concerned about plaintiffs' ability to prove the substantive elements of the claim.

To prevail on a fraud claim, a plaintiff must prove by clear and convincing evidence:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury.

Wieber v. FedEx Ground Package Sys., Inc., 231 Or. App. 469, 480, 220 P.3d 68 (2009) (internal quotation omitted).

Plaintiffs' counsel argues that if the parents knew J.S. had not signed the harassment complaint form, the parents might have contested the veracity of the allegations against G.R. and his criminal case might have had a different outcome. There is no evidence to support this argument. Moreover, the statement in J.S.'s handwriting, as well as G.R.'s admissions to Green once Green told G.R. that the school security video contradicted G.R.'s denials, support the conviction. I also note that the allegations in J.S.'s handwriting are quite similar to the allegations Green wrote in the harassment complaint form, although not verbatim. Plaintiffs have not raised a factual issue on the materiality of the alleged misrepresentation, their reliance on its truth, or their proximate injury.

Because of the failure to give notice under the OTCA and the lack of evidence to create a factual issue on some of the elements of fraud, I grant summary judgment and dismiss plaintiffs' deceit claim.

Additionally, I deny as moot Plaintiffs' Motion for Leave to Amend First Amended Complaint [65]. Plaintiffs sought the amendment to reinstate Green as an individual defendant under the deceit claim.

IV.    Discrimination Claims

Plaintiffs allege G.R. is qualified to receive special education benefits but was denied them because of his disability, in violation of ORS 659.850, Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act ("ADA").

The District moves for summary judgment dismissing these claims. It argues that plaintiffs cannot create a factual issue that G.R.'s disability played any role in the District's provision of educational services to him.

Plaintiffs point to many of the ways they claim the District denied G.R. an education, such as the failure to obtain his records from the prior school, the failure to implement a behavior plan despite numerous behavior incidents, the sham manifestation determination hearing, inadequate instruction, improperly convened IEP team meetings, and providing no educational benefit. Plaintiffs claim the District found G.R. eligible for benefits under the IDEA because of the very disability on which the District based its discipline and expulsion. According to plaintiffs, the District has thus admitted that G.R. was disabled and, but for his disability, he would not have engaged in inappropriate behavior. Plaintiffs contend this demonstrates many factual issues on the District's discrimination against G.R. because of his disability.

> To prove a public program or service violates Title II of the ADA, a plaintiff must show: (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) *such exclusion, denial of benefits, or discrimination was by reason of his*

Page 47 - OPINION AND ORDER

*disability*. See 42 U.S.C. § 12132 (emphasis added).  Similarly, under Section 504 of the Rehabilitation Act, a plaintiff must show:  (1) he is an "individual with a disability";(2) he is "otherwise qualified" to receive the benefit; (3) he was denied the benefits of the program *solely by reason of his disability*; and (4) the program receives federal financial assistance.  See 29 U.S.C. § 794 (emphasis added).

Weinreich v. Los Angeles Cnty., 114 F.3d 976, 978 (9th Cir. 1997) (footnote omitted) (citations omitted).  ORS 659.850 prohibits discrimination in schools which receive state funds.  "As used in this section, 'discrimination' means any act that unreasonably differentiates treatment, intended or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on . . . disability."  ORS 659.850(1).

Plaintiffs argue various ways in which the District denied G.R. a FAPE but fail to point to any evidence that the denial was because G.R. is disabled.  There could be many reasons why the District denied G.R. a FAPE, including negligence, incompetence, or discrimination based on his protected status other than disability.  Plaintiffs provide no evidence of the reason for the denial.  Thus, I grant summary judgment and dismiss plaintiffs' claims under ORS 659.850, Section 504, and the ADA.

## CONCLUSION

Defendant Dallas School District No. 2's Motion for Summary Judgment [57] is granted.  Plaintiffs' Motion for Summary Judgment [61] and Plaintiffs' Motion for Leave to Amend First Amended Complaint [65] are denied.  This action is dismissed with prejudice.

IT IS SO ORDERED.

DATED this ___4th___ day of October, 2011.


     _/s/ Garr M. King_____
     Garr M. King
     United States District Judge

Page 48 - OPINION AND ORDER